**Beatrice Thomas SOLOMON,
Plaintiff–Appellee,**

v.

**Walter ZANT, et al., Defendants,**

**Willis Marable, Defendant–Appellant.**

No. 89–8071.

United States Court of Appeals,
Eleventh Circuit.

Nov. 30, 1989.
As Amended Jan. 23, 1990.

Michael E. Hobbs, Asst. Atty. Gen., Atlanta, Ga., for defendant-appellant.

Richard A. Carothers, Lawrenceville, Ga., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, HATCHETT, Circuit Judge, and MORGAN, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In reversing the district court in this appeal regarding the enforcement of prison regulations, we distinguish between a prison official's right to immediately enforce regulations involving security and an inmate's right to only be punished in accord with due process.

## FACTS

On January 20, 1984, Van Roosevelt Solomon's lawyer arrived at the Georgia Diagnostic and Classification Center at Jackson, Georgia to see Solomon. The lawyer had followed the proper institutional procedures by calling the prison twenty-four hours ahead of time to set up his appointment with Solomon to discuss issues for an oral argument of Solomon's habeas corpus petition in this court which was scheduled for January 30, 1984. When the lawyer arrived at the institution, he was not permitted to see Solomon. Willis Marable, the official in charge of the visitation program at the prison, informed the lawyer that Solomon had refused to shave, and as a result of this infraction of the rules and regulations, Solomon could not visit with the lawyer.[1] Marable called to Solomon's cell block a second time to give him another chance to comply with the rules. Solomon again refused, and the visit was not allowed. The evidence indicated that the institution had not denied other inmates access to their lawyers for refusing to shave. Marable admitted that disciplinary procedures do not permit a disciplinary committee to deny an inmate access to his lawyer as a form of punishment. Nevertheless, Marable felt this was an appropriate form of discipline in Solomon's case and that it did not conflict with prison rules and regulations.

## PROCEDURE

Solomon brought this action pursuant to 42 U.S.C. § 1983 while incarcerated on death row at the Georgia Diagnostic and Classification Center.[2] After the filing of

---

1. Rule 125–2–8–.04(6) of the Official Rules and Regulations of the Georgia Department of Corrections provides as follows:

   Barber shops shall be maintained in accordance with standards established by the Department of Public Health of county board of health, as applicable. Each inmate shall have a conventional haircut. Hair shall not be longer than three (3) inches (with the limited exception defined in Chapter 125–2–5–.04); shall not extend beyond a point which would reach the collar on an ordinary shirt; and shall not cover any part of the ears or eyebrows. Inmates may wear sideburns no longer than a point even with the lower entrance of the ear canal. Mustaches are permitted, but shall not extend beyond the edge of the mouth and must be kept neat and trimmed at all times. Goatees, beards, and similar facial adornments are prohibited.

   In addition to the statewide "no-beard" policy contained in the Department of Corrections Rules and Regulations, in late 1983 a memorandum was issued to all staff member in "H–House," which was then Georgia's death row, which prohibited any death sentenced inmate from leaving the cell block unless all shaving requirements were complied with.

2. Title 42 U.S.C. § 1983 provides in pertinent part:

   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Co-

the lawsuit, the state of Georgia executed Solomon. The district court allowed his widow, Beatrice Thomas Solomon, to be substituted as party plaintiff. On May 26, 1988, a United States Magistrate held a non-jury trial, with the consent of the parties.

In an order dated June 9, 1988, the magistrate held that Marable violated Solomon's constitutional rights by refusing to allow him to visit with his lawyer. The magistrate held that Marable's decision to deny the visit was an "exaggerated response" to Solomon's persistent refusal to shave. The magistrate further held that Marable was not entitled to the defense of qualified immunity. The magistrate awarded Solomon $1 as nominal damages, and $1,500 as punitive damages, and all costs of the proceedings and attorney's fees.

### CONTENTIONS

Marable contends that his actions of enforcing the institutional policy of requiring all inmates to be clean shaven prior to leaving death row did not amount to an unconstitutional interference with Solomon's right of access to the court. Additionally, Marable contends that even if a constitutional violation occurred, he is entitled to qualified immunity. Finally, Marable contends that the magistrate erred in awarding punitive damages.

### ISSUE

The issue we consider is whether Marable, by enforcing the institutional rules and regulations, impermissibly deprived Solomon of his constitutional rights.

### DISCUSSION

■ An inmate's right to access to the court is not absolute. Likewise, restrictions on an inmate's access to counsel may be justified by security considerations. *See Procunier v. Martinez,* 416 U.S. 396, 412, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974),

*overruled on other grounds, Thornburg v. Abbott,* —— U.S. ——, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). "The extent to which that right is burdened by a particular regulation or practice must be weighed against the legitimate interest of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials." *Martinez,* 416 U.S. at 420, 94 S.Ct. at 1814. If the decision to deny the visit is viewed as nothing more than the application of the grooming policy, the policy must give way if its enforcement results in the denial of a constitutional right. *See Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969). If, on the other hand, a prison's practice or policy is "reasonably related to legitimate penological interests," *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the policy will be upheld as a valid restriction on an inmate's constitutional rights. In determining the reasonableness issue, the following relevant factors are generally considered: (a) whether a valid rational connection exists between the policy and the legitimate government interest; (b) whether an alternative means of exercising the constitutional right is available to the prisoner in spite of the policy; (c) whether, and the extent to which, accommodation of the asserted right will have an impact on other inmates, prison staff, or the prison resources in general; and (d) whether the regulation represents an "exaggerated response" to prison concerns. *Turner,* 482 U.S. at 89–91, 107 S.Ct. at 2661–2663. In this case, we must determine whether the institution's policy of enforcing the "no beard" rule is reasonably related to legitimate penological interest.

■ According to the testimony of prison officials, the institution's "no-beard" policy was instituted (1) to provide a legitimate security rule relating to the identification of inmates in the event of escape or other incidents, (2) to promote personal hygiene, and (3) to promote order and disci-

---

lumbia, subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges or immunities

secured by the constitution and laws, shall be liable to the party injured. . . .

pline. In *Shabazz v. Barnauskas*, 790 F.2d 1536 (11th Cir.1986), *cert. denied*, 479 U.S. 1011, 107 S.Ct. 655, 93 L.Ed.2d 709 (1986), this court upheld a similar regulation prohibiting beards. We upheld the policy in *Shabazz* under the "least restrictive means test" as a valid restriction of an inmate's claim of freedom of religion under the first amendment. As this court noted in *Shabazz*, the "no beard rule serve[s] a legitimate penological interest in preventing escape." *Shabazz* 790 F.2d at 1538. We hold that the policy which prohibits any death sentenced inmate from leaving the cell block unless all shaving requirements are complied with, is reasonably related to the government's legitimate interest in maintaining security in penological institutions.

Solomon does not seriously contest the policy, but instead argues that Marable applied the rule as punishment, and that his action was an "exaggerated response." While enforcement of any rule can be viewed as punishment, we conclude that prison officials instituted the "no-beard" rule because of security concerns. The fact that inmates who do not comply with the rule are not permitted to leave the cell block does not change its essential characteristics from a "security" measure.[3] We have noted, "the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints." *Procunier*, 416 U.S. at 412–13, 94 S.Ct. at 1811, 40 L.Ed.2d at 246.

The government is justified in refusing to send or deliver prisoner letters containing escape plans, or other proposed criminal activity, or refusing to transmit encoded messages. *See Procunier*, 416 U.S. at 413, 94 S.Ct. at 1811, 40 L.Ed.2d at 246. Enforcement of these and other valid security regulations do not implicate the prisoners' due process right. Institutions which seek to impose additional punishment on prisoners for violating a valid regulation must still afford an inmate the appropriate due process prior to such punishment. *See Wolff v. McDonnell*, 418

U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Deciding whether an institution's action involves enforcement of a restriction or punishment, requires that we examine the officials' actions. If an official acts within the scope of a valid governmental regulation, it is not punishment for the purposes of an inmate's right to due process. If, on the other hand, the action exceeds the scope of a valid governmental regulation, it is punishment which cannot be imposed without due process. For example, if Marable sought to punish Solomon beyond enforcing the restriction, Solomon would be entitled to a hearing. Marable could not have imposed physical punishment, denied Solomon food, or imposed other disciplinary measures without due process. Having found that the regulation which prohibits any death row inmate from leaving the cell block unless all shaving requirements are met is a valid restriction, we also find that Marable's action of preventing Solomon from leaving his cell was within the scope of the regulation. Thus, Marable properly prohibited Solomon from leaving his cell. *See Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). After finding that institutions can require that death row inmates be clean shaven, it is reasonable to conclude that compliance with the policy will not result in a constitutional violation. Our conclusion is supported by the general principles governing prison administration. In *Procunier*, the Supreme Court stated that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Procunier*, 416 U.S. at 405, 94 S.Ct. at 1807. "The problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." *Procunier*, 416 U.S. at 405, 94 S.Ct. at 1807. "Prison administration is, moreover, a task that has been committed to the responsibility of [the legislative and executive branches] and ... [w]here a state penal system is involved, federal courts have ... reasons to

---

3. For example, if an inmate is found in possession of a firearm, prison officials may take sion of a firearm, prison officials may take

possession of the firearm immediately, then punish after due process has been afforded.

accord deference to the appropriate prison authorities." *Turner*, 482 U.S. at 85, 107 S.Ct. at 2259.

### CONCLUSION

In conclusion, we hold that the institutional policy prohibiting inmates from leaving death row unless all shaving requirements are complied with, is a permissible restriction on an inmates access to the courts. We also hold that Marable's action of enforcing the rule does not violate an inmate's constitutional rights. In so concluding, we need not address the additional issues of qualified immunity or punitive damages. Accordingly, the judgment of the district court is reversed.

REVERSED